## GAINES v. MOLEN.

SPECIFIC PERFORMANCE: *Not enforced against defendant having no title.*
Molen for a valuable consideration executed to Gaines his obligation to convey to him an undivided half interest in two lots in the town of Hot Springs, within thirty days after he should acquire from the United States a patent or title to them, under the acts of Congress providing for the sale of said property by commissioners. Afterwards Molen, by proof of his improvements on the lots, procured from the commissioners a certificate of his right to purchase the lots, and thereupon Gaines filed his bill for specific performance of the contract, before Molen had paid for the lots or obtained from the United States any title to them. *Held:* That the bill was premature and should have been dismissed without prejudice. That Molen had no title or interest in the lots that a court of equity could enforce the contract against, and equity would not compel him to purchase or perfect his title for the enforcement of the contract.

APPEAL from *Garland* Circuit Court in Chancery,
Hon. J. M. SMITH, Judge of the Circuit Court.

Gaines v. Molen.

*R. G. Davies* and *J. M. Rose*, for appellants,

The contract is not illegal. The most that can be said of it was that it was an attempt to evade a law that never existed. His case comes within the rules laid down in *30 Ark., 555*. The contract is unobjectionable and should be enforced specifically. *16 Ark., 340*; *20 Ark., 615*; *19 Ib., 51*.

*U. M. & G. B. Rose*, also for appellants.

Contracts respecting improvements on public lands and pre-emption rights to those lands are valid in the absence of fraud. *15 Ark., 312*; *35 Id., 540*; *31 Id., 471*; *33 Id., 536*; *16 Id., 340*.

A contract, moral and reasonable in itself, will not be held invalid because a statute forbidding or annulling it could possibly have been passed. See *Toney v. McGehee, 38 Ark. 419*.

*R. G. Davies*, for appellant, additional brief.

This contract is not against public policy. *18 Wall., 307*; *1 Bissell, 23*; *3 Wallace, 97*; *13 Wallace, 291*; *Ib., 418*; *12 Howard, 24*.

There was no restriction in any of the acts in reference to Hot Springs. *Act Cong., March 3, 1877*; *Lewis Cases on Pub. Land Laws, 267*.

*G. W. Murphy*, for appellees.

1. The contract, being one to furnish testimony necessary to a suit or demand, is immoral, against public policy and void. *43 Cal., 369*; *10 Ala., 206*.

2. A contract wicked in itself, or prohibited by law, is void. *11 Wheaton, 258*.

3. An agreement by which one binds himself to settle on vacant land, procure title, and then convey it to another, is void. *Hard. Ky., 21*; *5 Yerg., 441*; *1 Black., S. C., U. S., 316*.

4.   The suit is premature, Molen never having, or not having at the commencement of the suit, obtained a patent or title.

*Clark & Williams*, also for appellees. .

1.   No trust ever arises upon a transaction which even has a reasonable suspicion of being a fraud, or. which contravenes public policy. Improvements belong to the one who makes them. *1 Wash. R. P., p. 3, sec. 4; 6 N. H., .555; 6 Greenl., 462; 15 Pick., 156.* Congress created a special tribunal which was finally to decide, and that decision cannot be impeached except for fraud. *9 Howard, U. S., 333; 98 U. S., 68.*

2.   At the time Gaines made the deed to Molen, his claim had been declared void, and he had nothing to convey. *.92 U. S., 698.* Molen's contract was *nudum pactum*.

3.   The provisions of the act March 3, 1877, *19 Stat. at Large, p. 377*, are for *claimants of improvements* and *occupancy* and no other. *Sec. 5-9-11.*

4.   If the relation of landlord and tenant could not exist, (*1 Dillon, 213*), that of vendor and vendee could not. If then no legal relations could arise there could be no trust. The contract was purely *voluntary*, as much so as if Molen had promised to give the land away *in futuro*. Such contracts are void. *2 Barn. and Ald., 551; 20 Vt., 595; .58 Ill., 360; 2 Gill & J., (Md.), 208; 22 La. Ann., 144; 7 John., 26; Wait Actions and Defences, vol. 3, p. 487.*

5.   The contingences had not arisen and the suit is premature.

6.   If Gaines had any rights, they arose in May, 1876, when the contract was made, and *sec. 5 of act, Statute at Large, p. 378*, provides that "No claim shall be considered which has accrued since April 24, 1876."

7.   The act June 16, 1880, confirms the adjudication of

the commissioners, and gives the right of purchase to those in whose favor they found. *21 Stat. at Large, p. 288.* This confirms the title in Molen on paying the purchase money.

EAKIN, J. By written agreement bearing date the first of January, 1876, Joseph Molen, for the express consideration of two hundred dollars, bound himself, within thirty days after he might acquire from the United States, a patent or title thereto, to convey to Wm. H. Gaines an undivided half interest in two lots in the town of Hot Springs, Garland county. They are described as lots numbered fifty-nine and sixty, in Smith Scogins' survey of Gaines' Addition to said town; and it is recited that said Gaines had, that day, sold and quit-claimed them to said Molen.

To enforce a specific performance of this agreement, this bill was filed on the sixth day of July, 1880, by Gaines and wife, alleging that about the first day of January, 1876, they were the owners of said land, and in effect, that they were in position to have been entitled to purchase and secure title to the same from the Federal Government under the provisions of the subsequent congressional act of March 3, 1877, in pursuance of which a new survey and plat of the lands had been made by the commissioners, so that the same property is now described as lot No. 4 in block No. 79. That being so entitled, complainant, Wm. H. Gaines, sold his interest in the property to Molen for the nominal consideration of four hundred dollars; the real consideration being the said written agreement; and that subsequently, on the first day of December, 1880, Molen had, by virtue of said conveyance, obtained from the Hot Springs commissioners the right to purchase said land, and had afterwards refused to comply with his agreement; but to avoid performance, had, on the twenty-fourth of May,

1880, conveyed the property to his wife, Louisa Molen, for the pretended consideration of two hundred dollars. There is a prayer for cancellation of this deed, and for general relief.

The deed from Gaines to Molen is exhibited with the agreement. The allegations concerning the deed of Molen to his wife, were evidently erroneous, and need not be further noticed.

Defendants answered, and denied that complainants were owners on the first of January, 1876, or entitled to purchase under the act of congress ; or that the consideration of the deed from Gaines was the written agreement to reconvey one-half ; or that Molen, by such conveyance, secured the right to purchase from the commissioners, claiming that he secured this right by virtue of his own improvements. They say the only pretence of right which Gaines ever had to the land, was as agent of the heirs of Ludovicus Belden, under a certificate of entry of the quarter section upon which it is situated, which had been held by the courts to be void. That, having that, he had verbally agreed in the latter part of the year 1875, that defendant Joseph Molen might take possession of it and make improvements and have all the resultant rights therefrom, and that he, the defendant Molen, did proceed to make improvements, and built a house. He says further, that in May, 1876, when efforts were being made at Hot Springs to procure the passage by congress, of a law authorizing those having improvements on lands in Hot Springs, to purchase the same, Gaines notified him of the anticipated enactment, and advised him to reside upon the land, which he did. He says that Gaines proposed to him, that if he would thus reside upon the land to strengthen his claim, and apply to purchase under the anticipated law, and acquire title, and would then convey to Gaines a half interest, he would on his part assist Molen with evidence in establishing such, his right—suggesting the

propriety meanwhile of keeping the agreement secret, lest a knowledge of it might prejudice Molen's chance of acquiring permission to purchase. To this said defendant agreed, and he says that on the fifteenth of May, 1876, Gaines executed to him the deed exhibited with the complaint, antedating it to January 1st in order to give it the appearance of having been executed before the twenty-fourth day of April, 1876, at which time the claim of the complainant to the whole of the lands claimed under said certificate had, in a direct proceeding, been held void by a decision of the supreme court of the United States. He says his agreement to convey half was executed at the same time. He says that when Gaines previously gave him permission to improve the land, he spoke of a like arrangement, and when the writings were made insisted that such had been the original arrangement. He insists that the purpose of Gaines in making the conveyance to him, and in keeping secret the written obligation of defendant to reconvey half, was to evade the policy of the law, and to make his own evidence more efficient in establishing the claim in defendant; and that therefore the written obligation was not filed for record until the right of defendant to purchase had been adjudicated by the commissioners. He says he filed his application to purchase in 1877, based on his improvements, which application was supported by the testimony of Gaines before the commissioners. He denies that there was any other consideration.

Further, defendant says that although he has obtained the certificate of the commissioners, fixing his right to purchase said lands from the United States, yet that he has not done so ; and that the United States has never issued a patent, nor been paid for the same.

By an amended answer he says further, that complainant made no application to purchase said land from the commissioners within the time prescribed by the act, and is therefore barred.

Also that complainants made application to purchase adjoining and surrounding lots, as agents and attorneys of Belden, and denies that Gaines individually had any such interest in the lot in controversy, as he might lawfully convey to defendant as the basis of the written agreement relied on. There is also a claim of homestead set up by defendant.

With regard to the first and third of these additional defences, it may be well to say at once, that they amount to nothing. If the circumstances under which defendant obtained his right to purchase were such as to raise a trust that he should hold his title thus acquired, as to a half, for the benefit of complainants, there was no necessity for an application by Gaines. Such an application would have conflicted with that of defendant, and have been in bad faith. Nor in such case could the claim of homestead have been made available. As to the second, setting up Gaines, fiduciary character, it could only be important in connection with the proof, in determining whether or not the heirs of Belden should be made parties, or entitled to enjoy the benefits of any trusts which might be decreed.

The first question which arises is, has the defendant any such interest in the subject matter ; any such estate legal or equitable, in the lots, as can be made the subject of specific performance? In other words, can he perform in any of the modes which a court of chancery will coerce?' If not, the whole enquiry as to the rights of complainant, is useless.

We think it could not be doubted on principle, that the courts of the state may, without conflict with the act of congress, impose upon legal titles derived through it, any trusts which, according to equity principles they might impose upon estates or interests derived from other sources. When the commissioners have adjudicated the right to purchase, and the sale has been perfected, the whole scope and

Gaines v. Molen.

policy of congress with regard to these lands will have been fulfilled. The lands pass thenceforth into the great mass of property subject to the state jurisdiction, provided only that the validity of the adjudication made by the commissioners, and the patent of the government be recognized as matters not to be questioned.

The law itself seems to recognize some equity in the claims of those who had made improvements upon these long disputed lands before the twenty-fourth day of April, 1876, when it was decided by the supreme court of the United States that the title was still in the government. With regard to these, commissioners were appointed for this and other purposes, were directed to hear proof offered by them of improvements and occupancy, and determine the right of each claimant or occupant to purchase the same or any portion thereof at an appraised value to be fixed by the commissioners, and to grant a certificate accordingly. This certificate conferred upon the claimant the right, at his option, and upon conforming to certain regulations of the act, to purchase the land within a certain time, or to remove his improvements. He was to be subject further to such regulations as the Secretary of the Interior might prescribe, in exercising the right. By the terms of the act, the right to purchase was given to "the claimant or occupant, his heirs, or legal representatives." No express provision is made for his assignee, or the vendee of the improvements, or a subsequent occupant under or through the original claimant.

The act makes it the duty of the commissioners to file, *without delay*, their report in the office of the Secretary of the Interior, and makes it his duty within thirty days after to instruct the land officers at Little Rock to allow such land to be entered, and to cause a patent to be issued therefor, of which the land officers are to give twenty days notice. At any time within twelve months of this notice, the claim-

ant to whom the certificate was granted may enter and pay for the land at the price fixed by the commissioners. In case he should fail to do so, then such lands, together with all the lands that no one has an adjudicated right to purchase, must be sold to the highest bidder at public auction, for not less than the appraised value. Then it is provided that any claimant or occupant who does not desire to purchase the lands adjudicated to him at the fixed valuation, may, within the time fixed for payment, remove the improvements.

There is no allegation that the defendant Molen has availed himself of this privilege. Nothing in the transcript to show that the payment has been made, or whether the opportunity remains open or has passed away. The proof is equally silent. This case must be considered as if the defendant held only the certificate. The defendant Molen, by his answer sworn to on the ninth of July, 1881, says that he had not paid then, and the patent had not been issued. We are not advised when the certificate was issued, the date given in the transcript being obviously erroneous.

It is not every equitable *right* which one may have concerning land, which rises to the dignity of an equitable *title*. For instance there is a large class of rights which spring from the rights of subrogation, marshalling and equitable liens. The defendant Molen has, or had at the commencement of this suit, perhaps, a certain right regarding these lots, but certainly no legal title. The question narrows to this ; did the right amount to an equitable title—one which a court of equity could effectually divest him of and give to another in the exercise of any of its known remedial processes. Courts of equity cannot risk the humiliation of being legally defied, and never attempt that which, in theory, they cannot enforce. If we were to concede, as we are inclined to do, that the matter of obligation of defendant is legally binding, and not in contravention of the law of

Gaines v. Molen.

congress, and such as might on breach, be made the subject of an action for damages, still in casting about to devise a scheme for affording equitable relief upon the pleadings, a chancellor would be involved in grave perplexities. If he were to order that Molen execute a deed to Gaines for a half interest, he would do a futile thing, for Molen has nothing but a personal right to purchase which will be lost by a short lapse of time, if not already gone. Of what avail would an order be divesting Molen of a half interest and vesting it in Gaines? Its effects could not reach beyond a year from the date of the land agent's advertisement. After that the United States government, or a purchaser under it, if Molen should not purchase, would take the land. An order to the land agent or any other federal official on payment of the money to execute or procure a patent to Gaines and Molen jointly might and should be disregarded. If Molen should be ordered to pay within the time, and thus obtain a title, how can that be enforced? The complainants do not offer to advance the money, nor advise the court how much is necessary. It may be that Molen has none, and chancery will not, if it could, compel a man to earn or borrow or beg money to carry out a mandatory injunction for enforcement of a contract. It is chary of making such injuctions in any case, but will sometimes direct expensive operations to repair a wilful wrong, such as a hurtful nuisance. I cannot recall a precedent, or find a principle, for compelling one to purchase lands for the purposes of specific performance. To make an order declaring a trust in the future if Molen shall exercise the option of purchasing would be trifling with its powers, as he might, on that account, obstinately refuse to purchase at all, in time.

There is but one solution of the difficulty, and that is found in the conclusion that as yet Molen has no title legal or equitable, but only a right, which he may exercise or not

at his option, and which option is beyond the control of the court. The condition upon which the conveyance was to be made has not arisen.

The chancellor upon hearing dismissed the bill. This was proper. It was at least premature. We do not mean now to question the power of a State court of equity to affix a trust upon a title derived through the Hot Springs commissioners. No principle suggests itself to us for placing such titles on grounds different from those acquired from the United States government through ordinary entries; and it is common to impose trusts upon such titles when acquired under circumstances from which, according to well settled principles of equity, resultant or constructive trusts arise; and to enforce trusts like this, expressly declared. What the merits of this particular controversy may be under the evidence, we do not determine. The bill should have been dismissed in any view as premature; but without prejudice. The chancellor erred only in dismissing it absolutely. In all other respects the decree is correct.

Render the proper decree here, and let the costs of this court be awarded against the appellant. The modification of the decree is in his favor to avoid the consequences of an ill-timed suit, but the decree is correct in substance, and it remains true that he has troubled the court unnecessarily.